CONRAD C. RENNER, PETITIONER-RESPONDENT, v. R. L.
TOOL & DIE COMPANY, RESPONDENT-APPELLANT.

Argued October 14, 1970—Decided November 16, 1970.

Mr. *Edwin J. McCreedy* argued the cause for respondent-appellant (*Messrs. Conant, Halberstadter & McGuire,* attorneys).

Mr. *Manny Gerstein* argued the cause for petitioner-respondent (*Mr. William G. Brigiani* on the brief; *Messrs. Marra, Brigiani, Cherin & Gerstein,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. In this case, the petitioner sought compensation for a percentage of permanent disability allegedly resulting from an employment-produced heart attack. The Workmen's Compensation Division found in his favor, but the County Court reversed. The Appellate Division, in an unreported opinion, reversed the County Court and ordered the award of compensation reinstated. This Court granted appellant's petition for certification. 56 *N. J.* 243 (1970).

 Study of the record has led us to the conclusion that the evidence falls far short of showing an employment-related heart attack within the broad boundaries of *Dwyer v. Ford Motor Co.,* 36 *N. J.* 487 (1962). In *Dwyer,* the Court, responding to the legislative direction for liberal administration of the Workmen's Compensation Act, went as far as it could reasonably go in recognizing a causal connection between employment stresses and strains and a heart attack. To go any further would be to confer compensability on every heart attack that occurs while the employee is at work. It is for the Legislature and not for the

courts to establish monetary benefits of that nature, beyond those provided by the Temporary Disability Benefits Law, *N. J. S. A.* 43:21–25, 29, 39.

We adhere to the view propounded in *Dwyer* that in heart cases the employee has "the burden of showing by the preponderance of the believable evidence that the ordinary work effort or strain in reasonable probability contributed in some material degree to the precipitation, aggravation or acceleration of the existing heart disease * * *." The significance of "some material degree" means an appreciable degree, a degree greater than *de minimis*. It means that there was some employment stress or strain which was medically capable of and which did cause or contribute in an appreciable degree to the heart attack. *Dwyer, supra,* 36 *N. J.* at 493–494, 512. But we cannot find in the record here any evidence which sufficiently satisfies that test to warrant an award of compensation.

The theory on which recovery was sought was that, during the course of his employment, Renner had been subjected to emotional stresses and strains which caused or contributed to the production of a myocardial infarction on November 29, 1965 while he was at work.

Prior to that date, Renner had been in the employ of appellant, R. L. Tool & Die Company, as a tool and die maker for seven years. He had been doing similar work for about 12 years before entering appellant's employment. Most of his activity for appellant was surface grinding on a milling machine. It was a precision operation requiring "a tolerance, in most cases, * * * of one ten thousandth of an inch." Apparently, the tolerances were machine set through the use of micrometers or indicators. The grinding was conducted in a temperature controlled room; the hands of the grinder "cannot be sweaty;" the "piece" cannot be held "too long" because the body temperature may make it larger than "it really is." Renner said in answer to an obviously leading question: "[t]his type of work is under tension." He offered no explanation as to what the answer

meant. Not a single word was said by him indicating that the work made him nervous or upset or caused emotional disturbance or upheaval at any time, or that it interfered with sleeping or eating or his relations with his family, friends or fellow employees.

In describing his relationship with his four fellow employees and his employer, he said:

"Well, it was a friendly one, but not that friendly to be sociable with them too much, and one fellow and I weren't speaking to each other. We were friends for awhile, but for some reason we weren't speaking to each other. The boss wasn't too friendly. At times, he wouldn't even speak, maybe for two weeks at a time, other than just real sharply at what the job concerned."

Further describing the "boss," Renner said he was not a "friendly sort of person. * * * At times, he was a rough type. He would not talk to anybody."

The above is the sum and substance of petitioner's testimony about his work and the environment in which he operated. If he was adversely affected in any way, emotionally, nervously or mentally, he did not say so. Another employee said the boss was "nasty" and subjected the four employees, including Renner, to verbal abuse if they made grinding errors. In explaining what he meant by "nasty" he said the boss got "sort of" excited. And the witness conceded that he too might have gotten excited if a "piece" was ruined after a considerable number of man hours had been put into it; he "imagined" that that would be reasonable. He said the boss yelled at Renner as well as at the other employees at times, but he could not remember the last time this happened prior to November 29, 1965 — whether it was "a day or two days or 20 days or six months." Furthermore, he conceded that whenever a grinder spoiled a die, the employer absorbed the loss; he did not charge it to the employee. This witness was subjected to much leading questioning in testifying as he did. A dispassionate reading of his examination engenders serious doubt as to the weight

of his testimony. Plainly, he was most interested in further-ing Renner's claim. At any rate, even accepting his asser-tions, it cannot be overlooked that Renner gave no testi-mony indicating that either his work or his boss upset him emotionally or made him nervous.

On November 29, 1965, Renner reported for work at 7:30 A.M., set up his grinding machine and adjusted the controls. His operation for that morning was not unusual; he was to reduce the parts of a die to "a couple of thou-sandths of an inch." His activities between 7:30 and 9:30 A.M. apparently were routine and uneventful. There was no untoward event of any kind and no employer or employee unpleasantness. Renner took the usual coffee break at 9:30 and thereafter returned to his machine. He turned the handles on the machine to "put the table in line with the cutter." At this time he started to cough, began to perspire and suffered chest pains. When the pains continued, ac-companied by difficulty in breathing, he was taken to a clinic and from there to St. Peter's Hospital in New Brunswick.

At the hospital, a diagnosis of posterior wall myocardial infarction was made. Renner remained there for three weeks and returned to work on February 7, 1966. At the hearing which resulted in the judgment now under appeal, he was found to have a resulting permanent disability of 30% of total.

Petitioner produced a single medical witness in support of his claim for compensation. The doctor was an examin-ing and not a treating physician. In answer to a hypo-thetical question containing alleged facts which he was asked to assume, the doctor gave the opinion that the heart attack was the result of the work-connected emotional stress and strain which was described in the question. The difficulty is that the really important and material hypothesized facts were either overdrawn or not supported by the petitioner's testimony. For example, the doctor assumed that the em-ployer created "tension in the one room work area by in-sulting employees and yelling at them at close proximity

* * *." Renner did not say at any time that he was conscious of, or in any way felt, any employer-created tension, that he was ever disturbed or emotionally upset by it or that he suffered any adverse reaction or consequences as the result of such tension on any one occasion. Certainly he gave no indication that he was chronically exposed to such employer-created tension or that he suffered repeated emotional upset stimulated thereby.

The doctor was asked also to assume that the employer, at the time of Renner's heart attack, was "negotiating with two other employees, now the owners, for the purchase of R. L. Tool & Die Company and [that Renner] was being left out and being put off concerning the status of this venture * * *." Aside from the absence of evidence of these facts in the case, the more critical aspect for purposes of appraising the compensability of petitioner's claim is that Renner did not testify that the alleged negotiations, if they did exclude him, subjected him to any emotional upset or worry or strain. Moreover, the question to the doctor did not ask him to assume that any such worry or emotional upset existed. In our view, it is not so much the absence from the record of the pertinent facts regarding existence of the asserted negotiations as it is the absence of proof that, if they did exist, they induced any emotional upset or strain in Renner.

In further connection with the hypothetical question, it cannot escape attention that although it described the nature of Renner's work, it did not ask the doctor to assume that the work caused him any emotional strain or nervousness, either chronic or on a single occasion. It was proper, of course, not to include such assumption in the question because Renner never said he experienced such consequence.

In spite of the absence of the fact basis just noted, the doctor said the heart attack was causally related to the employment because "of the emotional stress and strain described to me in the hypothetical question." And in stating his opinion, he specifically noted that Renner "was subjected to

additional emotional stress and strain in regards to the negotiations that he and two other employees were engaged in in an effort to purchase this company from their employer." (Note that his factual assumption here did not even conform to the allegations contained in the hypothetical question.) In our view, factual support for the assumptions made by petitioner's medical witness was so deficient that no fair or reasonable basis existed for his opinion that the employment caused or contributed to the myocardial infarction. In the face of such material deficiency in the proof, it must be said that the petitioner's case presented no substantial support for an award of compensation.

The judge, in granting compensation, fell into grievous error in evaluating the evidentiary basis for petitioner's claim. He not only made and relied upon most of the same unsupported factual assumptions as the medical witness; he added material substance to insubstantial facts. For example, in his opinion he said, "[j]ust prior to the time the petitioner had his attack, the boss had become excited and yelled at him." Petitioner did not so testify. The only other fact witness produced by petitioner (the value of whose testimony, we have already said, was open to serious question) said nothing about any such incident on direct examination although he had spoken about the boss getting "excited" and "mad" on occasions about inaccurate work. On cross examination his attention was directed to November 29, 1965 and he was asked:

"Q. And you don't know whether the boss was annoyed that day, do you?
A. No, I don't."

After some redirect examination, the court questioned the witness:

"THE COURT: When was it that you last recall that he yelled at Mr. Renner?
THE WITNESS: Gee. I really wouldn't know.
Q. Can you fix it within months or weeks of November 29, 1965?

A. Yes, I think so.

THE COURT: When?

THE WITNESS: Just before he had the heart attack. I believe he was working on something; something but I am not absolutely sure.

Mr. Doran: What date are we referring to, Your Honor?

THE COURT: We're trying to find out the last time that you recall that he yelled at Mr. Renner, and you said that it was just before the heart attack. You don't know that same day, do you?

THE WITNESS: No.

The court contniued to press for some more definite statement and later said:

"* * * Just think and see if you can tell us when was the last time. How long prior to November 29?

THE WITNESS: Gee, I wouldn't be able to remember.

THE COURT: What's that?

THE WITNESS: I wouldn't remember.

THE COURT: You wouldn't remember. Was it a day or two days or twenty days or six months?

THE WITNESS: No."

Petitioner was examined on behalf of appellant by a specialist in internal medicine and cardiology. The doctor found evidence of a healed myocardial infarction and in answer to essentially the same hypothetical question put to petitioner's medical witness, he said there was no causal relation between the employee's work and the heart attack. He saw nothing in the working conditions to justify a conclusion that Renner had been subjected either to such chronic mental or emotional tension or to a single mental or emotional stress incident which could be said to have caused or contributed to the attack. In his view, this case presented nothing more than the ordinary tensions which the vicissitudes of life and work impose on people, and in terms of causal connection the employment environment to which Renner was exposed did not reach even the *de minimis* level.

The County Court reversed the Division's award of compensation on two bases: (1) inadequacy of the hypothetical

question put to petitioner's medical witness, and (2) inadequacy of the proof to support the award.

The deficiency in the hypothetical question was declared to be the absence of proof supporting the assertion that negotiations for sale of the employer's business were going on at about the time of the heart attack. We agree that the supporting facts were not in evidence. However, as indicated earlier, their presence or absence made no substantial difference because Renner did not say the negotiations imposed any emotional strain on him. The second ground of reversal — which was overlooked by the Appellate Division — was that petitioner had failed to sustain the burden of proving causal connection between the working environment and the heart attack. In that connection the County Court said:

"In the case sub judice, the petitioner has failed to prove that he was tense immediately before the accident, or for that matter, there was no proof at all as to when petitioner had been tense and upset. The only proof set forth was that the employer was nasty at times when work was 'ruined' but no one could state any exact instance. This Court is of the opinion that such evidence is de minimis and does not satisfy the test of 'some material degree,' and that petitioner has failed to sustain the necessary burden of proof."

As we have noted, the Appellate Division reversed the County Court and ordered the award of compensation reinstated. This action was taken because that court found that the circumstances relating to inclusion in the hypothetical question of the alleged facts concerning the alleged sale of the employer's business, were such that it was not error to include them. But in ordering the reversal, no consideration at all was given to the principal issue, i. e., whether the petitioner's proof warranted an award of compensation. The opinion makes no reference at all to that crucial question. Therefore, the Appellate Division action can play no influential role in connection with the discharge of the duty of our Court to review the sufficiency of the evidence to support its judgment.

On the record presented, the County Court was correct in holding that petitioner had failed to establish a compensable heart claim. The evidence provides a less substantial basis for recovery than that appearing in *Walck v. Johns-Manville Products Corp.*, 56 *N. J.* 533 (1970) where this Court denied compensability. Consequently, we are constrained to reverse the action of the Appellate Division and affirm the judgment of the County Court.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.