773 A.2d 659

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. SAMUEL
A. MANZIE, DEFENDANT–RESPONDENT.

Argued March 13, 2001—Decided June 13, 2001.

*Lisa Sarnoff Gochman,* Deputy Attorney General, argued the cause for appellant (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney).

*John Michael Vazquez* argued the cause for respondent (*Michael Critchley & Associates,* attorneys; *Mr. Critchley,* of counsel).

PER CURIAM.

The members of the Court being equally divided, the judgment of the Appellate Division, reported at 335 *N.J.Super.* 267, 762 *A.*2d 276 (2000), is affirmed.

STEIN, COLEMAN, and ZAZZALI, JJ., concurring

■ We would affirm the judgment of the Appellate Division based on our concurrence with that court's conclusion that the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2, does not apply to murder. *State v. Manzie,* 335 *N.J.Super.* 267, 278, 762 *A.*2d 276 (2000). We add these additional observations to amplify our agreement with the Appellate Division's determination that "if the Legislature had intended NERA to apply to murder, it would have done so expressly and by amending the murder statute." *Id.* at 276, 762 *A.*2d 276.

In pertinent part the murder statute provides as follows:

Murder is a crime of the first degree but a person convicted of murder shall be sentenced, except as provided in subsection c. of this section, by the court to a term of 30 years, during which the person shall not be eligible for parole, or be

sentenced to a specific term of years which shall be between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole.

[*N.J.S.A.* 2C:11–3b(1).]

The Appellate Division carefully explained the primary inconsistency between NERA and the murder statute:

Murder is the only crime for which life imprisonment is an available ordinary sentence. *See* [*State v.*] *Serrone, supra,* 95 *N.J.* [23,] 25, 468 *A.2d* 1050 [ (1983) ]. But, NERA does not define what would constitute 85% of life for the purpose of applying NERA's parole ineligibility period.... The absence of such a definition suggests that the Legislature did not intend that NERA would apply to murder.

[*Manzie, supra,* 335 *N.J.Super.* at 275–76, 762 *A.2d* 276.]

The Attorney General addressed that inconsistency in his Appellate Division brief. Although acknowledging that neither NERA nor the murder statute informs defendants of the penal consequences of applying NERA to a life sentence for murder, the Attorney General referred to paragraph L of the "Attorney General Directive for Enforcing the 'No Early Release' Act," which provides as follows:

L. *Effect of Life Sentence*

Where a defendant subject to the No Early Release Act is sentenced to a life term, other than one that provides for life imprisonment without possibility of parole, *see e.g., N.J.S.A.* 2C:11–3b(2) and 2C:43–7.1, the prosecutor in the course of plea negotiations and litigation shall proceed as if the defendant were to be sentenced to a custodial term of 75 years and must thus remain ineligible for parole for a term of 63.75 years (85% of 75 years).

[*Attorney General Directive for Enforcing the "No Early Release" Act* 12 (April 24, 1998).]

The Attorney General supports his assertion that a life sentence for murder that was subject to NERA equates to 63.75 years without parole by noting:

This calculation is derived from *The Parole Book, A Handbook on Parole Procedures for Adult and Young Adult Inmates* (Third Ed.1996) [Parole Book], published by the New Jersey State Parole Board, which explains that parole ineligibility terms (other than mandatory minimum terms) are equal to one-third of the maximum sentence imposed under the Code of Criminal Justice. In the case of a life sentence with no mandatory minimum term, parole eligibility is 25 years. Since 25 is one-third of 75, a life sentence in terms of parole eligibility is equal to 75 years.

The Attorney General's determination, based on the Parole Book, that a life sentence is equal to seventy-five years for purposes of parole eligibility is consistent with those provisions of the parole statutes that provide that prisoners sentenced to State Prison without a mandatory parole ineligibility term become primarily eligible for parole after serving one-third of the sentence imposed, less credits, *N.J.S.A.* 30:4–123.51(a), and that prisoners serving a life sentence without parole ineligibility terms become primarily eligible for parole after serving twenty-five years, less credits, *N.J.S.A.* 30:4–123.51(b). In our view, however, neither the Parole Book nor the cited provisions of the parole statutes satisfactorily address the gaping ambiguity that would encumber the murder statute if we were to hold that NERA applied to murder.

■ A strong constitutional underpinning supports the Appellate Division's conclusion that NERA could not apply to murder unless the murder statute were amended to indicate clearly and specifically a murder defendant's penal exposure under NERA. "We begin with the general principle that every person is entitled to know, with reasonable exactitude, the penal consequences of any criminal charge he or she is called upon to defend against." *State v. Thomsen,* 316 *N.J.Super.* 207, 214, 719 *A.*2d 1288 (1998) (citing *State v. Howard,* 110 *N.J.* 113, 124–25, 539 *A.*2d 1203 (1988)).

The due process principle that protects criminal defendants against the imprecision of vague penal statutes most often is applied in cases challenging whether a statute adequately defines the crime with which defendant is charged. In *Lanzetta v. New Jersey,* 306 *U.S.* 451, 59 *S.Ct.* 618, 83 *L.Ed.* 888 (1939), a New Jersey statute making it a crime to be a gangster was invalidated on due process grounds for vagueness, but the breadth of the Supreme Court's articulation of the controlling constitutional principles is highly pertinent to the issue before us:

> If on its face the challenged provision is repugnant to the due process clause, specification of details of the offense intended to be charged would not serve to validate it. It is the statute, not the accusation under it, that prescribes the rule to govern conduct and warns against transgression. *No one may be required at peril*

*of life, liberty or property to speculate as to the meaning of penal statutes.* All are entitled to be informed as to what the State commands or forbids. The applicable rule is stated in *Connally v. General Const. Co.,* 269 *U.S.* 385, 391, 46 *S.Ct.* 126, 127, 70 *L.Ed.* 322: "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."

[*Id.* at 453, 59 *S.Ct.* at 619, 83 *L.Ed.* at 890 (emphasis added) (citations omitted) ].

■ That principle of due process applies with equal force to ambiguous sentencing provisions. *See United States v. Batchelder,* 442 *U.S.* 114, 123, 99 *S.Ct.* 2198, 2204, 60 *L.Ed.2d* 755, 764 (1979) ("So too, vague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute."). The Supreme Court most recently applied those same due process principles in a sentencing context in *Lankford v. Idaho,* 500 *U.S.* 110, 111 *S.Ct.* 1723, 114 *L.Ed.2d* 173 (1991). There, the defendant was prosecuted and convicted for first-degree murder under an Idaho statute that authorized imposition of the death penalty for that crime. After the defendant's conviction the prosecutor informed the trial court that the State would not seek the death penalty at sentencing. At the sentencing proceeding neither the prosecutor nor defense counsel addressed the possibility that a death sentence could be imposed. After the sentencing hearing, the trial court, acting pursuant to Idaho law, imposed the death sentence on defendant. The Supreme Court, on due process grounds, reversed the defendant's death sentence. The Court stated:

Although the trial judge in this case did not rely on secret information, his silence following the State's response to the presentencing order had the practical effect of concealing from the parties the principal issue to be decided at the hearing. Notice of issues to be resolved by the adversary process is a fundamental characteristic of fair procedure.

Without such notice, the Court is denied the benefit of the adversary process.

. . . .

Petitioner's lack of adequate notice that the judge was contemplating the imposition of the death sentence created an impermissible risk that the adversary process may have malfunctioned in this case.

[*Id.* at 126–27, 111 *S.Ct.* at 1732–33, 114 *L.Ed.*2d at 187–89. ]

Our state's jurisprudence reflects the same concerns about fair notice that were at the root of the Court's decision in *Lankford. See, e.g., State v. Thomsen, supra,* 316 *N.J.Super.* at 216, 719 *A.*2d 1288 (holding that defendant who was charged and convicted by jury of fourth-degree eluding of police by motor vehicle, an offense that when committed had been reclassified by legislature as a second-degree offense, could not be sentenced as second-degree offender because lack of notice of penal consequences deprived defendant of fair trial); *State v. Koch,* 161 *N.J.Super.* 63, 66–67, 390 *A.*2d 1192 (App.Div.1978) (reversing on due process grounds defendant's disorderly persons conviction where County Court, on *de novo* appeal from conviction of violation of the Motor Vehicle Act, *sua sponte* amended complaint to charge defendant with disorderly persons offense; and stating that "defendant was deprived of the opportunity to prepare and defend against the new charge . . . a charge relating to an offense of an entirely different character and magnitude . . . [and] that such an amendment deprived defendant of the due process or fundamental fairness inherent in any penal proceeding").

Those same due process considerations have informed our case-law concerning whether defendants who plead guilty to one or more criminal charges are informed about the penal consequences of the plea. *Rule* 3:9–2 of the Rules Governing Criminal Practice mandates that a court not accept a guilty plea without first determining that "the plea is made . . . with an understanding of the nature of the charge and the consequences of the plea." *R.* 3:9–2. Our cases emphasize that a guilty plea will not be enforced unless the defendant clearly understood the penal consequences of that plea. *See State v. Burford,* 163 *N.J.* 16, 21–22, 746 *A.*2d 998 (2000) (noting that defendant who pled guilty could not be subject to sentencing under NERA unless defendant was informed of exposure to parole ineligibility term mandated by NERA); *State v. Kiett,* 121 *N.J.* 483, 492, 582 *A.*2d 630 (1990) (holding that juvenile was entitled to withdraw guilty plea to murder to which he had agreed to avoid death penalty for which he mistakenly

thought himself eligible); *State v. Howard,* 110 *N.J.* 113, 125, 539 A.2d 1203 (1988) (holding that defendant who pled guilty to charge of second-degree sexual assault without being informed of parole implications of Avenel sentence should be permitted to withdraw his plea); *State v. Kovack,* 91 *N.J.* 476, 484, 453 A.2d 521 (1982) (vacating defendant's sentence and remanding for resentencing on ground that defendant, who pled guilty to aggravated sexual assault charge, was not informed concerning his exposure to period of parole ineligibility as part of his sentence); *State v. Brown,* 71 *N.J.* 578, 582, 367 A.2d 417 (1976) (permitting defendant to withdraw plea of *non vult* to murder because of misunderstanding between prosecutor and defense counsel about meaning of prosecutor's agreement to make "no recommendation" concerning sentence); *State v. Nichols,* 71 *N.J.* 358, 360–61, 365 A.2d 467 (1976) (permitting defendant who pled guilty to armed robbery and *non vult* to murder to withdraw plea because defense counsel incorrectly informed defendant that if tried and convicted he faced consecutive sentences for murder, armed robbery and robbery).

That consistent recognition throughout our criminal jurisprudence of the due process concerns that are implicated when a defendant is inadequately informed about the penal consequences of the charged offense demonstrates the flaw in the State's legal position. We simply find it inconceivable that, mindful of the constitutional concerns to which we have adverted, the Legislature would intend that the meaning of critical provisions of the Code of Criminal Justice relating to the crime of murder could be made ambiguous by the application of NERA to that section of the Code, the ambiguity to be overcome by supplementing the Code provisions relating to murder with the terms of the "Attorney General Directive for Enforcing the 'No Early Release' Act." That contention simply cannot be sustained. To do so would create the potential that in any murder prosecution a defendant might contend that the statutory ambiguity created an uncertainty about the penal consequences to which that defendant was exposed.

Basic principles of due process, as well as clarity in statutory draftsmanship, mandate that if the Legislature intends NERA to apply to murder, the section of the Code relating to murder must be amended to clearly reflect that intention and eliminate the ambiguity and uncertainty that the application of NERA to the present Code provision would create.

PORITZ, C.J., LONG, J., and LAVECCHIA, J., dissenting.

The preeminent principle guiding a court's search for legislative intent is the plain language of a statute. *State v. Butler*, 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982). In interpreting a statute, the words are to be given their ordinary and well understood meaning. A court should not presume that the Legislature intended something other than what it expressed by way of its plain language. *State v. Wright*, 107 *N.J.* 488, 495, 527 *A.*2d 379 (1987). If a statute "is clear and unambiguous on its face and admits of only one interpretation," this Court "need delve no deeper than the act's literal terms to divine the Legislature's intent." *State v. Butler, supra*, 89 *N.J.* at 226, 445 *A.*2d 399. That is the backdrop on which the "No Early Release Act" (NERA) should be interpreted.

NERA provides that:

a.  A court imposing a sentence of incarceration for a crime of the first or second degree shall fix a minimum term of 85% of the sentence during which the defendant shall not be eligible for parole if the crime is a violent crime as defined in subsection d. of this section.

. . . .

d.  For the purposes of this section, "violent crime" means any crime in which the actor causes death, causes serious bodily injury as defined in subsection b. of *N.J.S.* 2C:11–1, or uses or threatens the immediate use of a deadly weapon. "Violent crime" also includes any aggravated sexual assault or sexual assault in which the actor uses, or threatens the immediate use of, physical force.

[*N.J.S.A.* 2C:43–7.2a, –d.]

Like the Appellate Division, we agree that the language of NERA is clear and unambiguous on its face. Nothing in that statute suggests overtly or even obliquely that murder, which meets both the grading section of the statute and its definitional section, falls outside the scope of its coverage.

Where we part company from the Appellate Division, and from our colleagues, is in connection with their conclusion that there is a conflict between NERA and the murder statute.

The murder statute provides in relevant part that:

Murder is a crime of the first degree but a person convicted of murder shall be sentenced, except as provided in subsection c. of this section, by the court to a term of 30 years, during which the person shall not be eligible for parole, or be sentenced to a specific term .of years which shall be between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole.

[*N.J.S.A.* 2C:11–3b(1).]

The Appellate Division determined that that statutory language cannot exist side by side with NERA and that the failure of the Legislature to amend the murder statute to resolve the conflict with NERA reveals its intent that NERA not be imported into the murder scheme.

We do not read the statutes as in conflict. On its face, *N.J.S.A.* 2C:11–3b(1) requires that every defendant convicted of murder must serve thirty years in jail on a sentence of between thirty years and life. Effectively, where a thirty-year sentence is imposed, the parole disqualifier is 100%. NERA does not thwart that scheme but merely superimposes on all statutes to which it applies the requirement that all persons convicted of violent crimes serve 85% of the sentence imposed. The murder statute is thus entirely effective under NERA. Although it has been argued that because 85% of thirty years is twenty-five and one-half years, NERA renders the $^{30}\!/_{30}$ murder sentence invalid, NERA specifically states: "The provisions of subsection a. of this section shall not be construed or applied to *reduce* the time that must be served before eligibility for parole by an inmate sentenced to a mandatory minimum period of incarceration." *N.J.S.A.* 2C:43–7.2b (emphasis added). Thus, murder defendants continue to be subject to the exact sentencing scheme provided in the murder statute: thirty years to life. The fact that a defendant sentenced to thirty years with a thirty-year parole disqualifier, a frequently-imposed sentence under the murder statute, is effectively serving a 100% parole disqualifier does not conflict with NERA, whose statutory

purpose is satisfied if a defendant serves only 85% of his or her base term.

Moreover, the application of NERA to murder is an analogue to its application to Graves Act offenses. *N.J.S.A.* 2C:43–6c. The Graves Act provides parole ineligibility at, or between, one-third and one-half of defendant's sentence. *Ibid.* Yet we have imposed the 85% NERA disqualifier upon otherwise qualified Graves Act defendants. *State v. Rumblin,* 166 *N.J.* 550, 557, 766 *A.*2d 1141 (2001). To the extent that NERA has been applied to Graves Act offenses without a statutory amendment, it follows that no amendment is required here. Like the murder statute, the Graves Act sets up a distinct sentencing scheme for firearms' offenses. If there was no need to amend the Graves Act to apply NERA, there is no need to amend the murder statute.

We also disagree that because "life" is not defined in the murder statute itself, it can be concluded that the Legislature did not intend NERA to apply. To debunk that conclusion, one need only look to the fundamental argument the Appellate Division advanced in declaring the statute ambiguous: that we should resort to other expressions of the legislative will to determine NERA's meaning. The Appellate Division was willing to resort to other statutes to conclude that NERA does not apply to murder. The same can be done to save it. *N.J.S.A.* 30:4–123.51, a legislative enactment in the cognate parole context, provides that where no mandatory minimum sentence is imposed, a defendant must serve one-third of his or her sentence before becoming eligible for parole. *N.J.S.A.* 30:4–123.51a. Where a life sentence is imposed, twenty-five years is declared by that statute as the period of disqualification. By imposing that disqualifier, the Legislature expressed the reasoned judgment that seventy-five years is equivalent to "life." That seventy-five year figure, in turn, has been adopted by the Attorney General in a directive that specifically calculates the 85% NERA disqualifier on a life sentence for murder. *Attorney General Directive for Enforcing the "No Early Release" Act* 12 (April 24,1998).

In sum, NERA is neither facially ambiguous nor is it rendered ambiguous by resort to other conflicting statutes. That said, nothing in our jurisprudence suggests that it is acceptable to invoke extrinsic evidence to defeat the very words of an unambiguous enactment. Separate and apart from the fact that we view the extrinsic evidence in the case as less persuasive and more equivocal than did the Appellate Division, there is simply no authority for resorting to such evidence in these circumstances.

Finally, we disagree with our colleagues that any due process violation is implicated here. Unlike the defendant in *State v. Burford*, 163 *N.J.* 16, 21–22, 746 *A.*2d 998 (2000), this defendant entered a plea of guilty pursuant to a plea bargain that specifically incorporated NERA and was fully informed of the penal consequences that lay before him.

For the foregoing reasons, and because it is inconceivable to us that the Legislature intended what it viewed as the salutary effects of NERA to apply to the most serious crimes, but not to the ultimate crime, we respectfully dissent.

*For affirmance*—Justices STEIN, COLEMAN and ZAZZALI—3.

*For reversal*—Chief Justice PORITZ and Justices LONG and LaVECCHIA—3.